IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ENERGYSOLUTIONS, LLC,<br><br>    Plaintiff,<br><br><br><br><br>                    vs.<br><br><br>NORTHWEST INTERSTATE COMPACT ON LOW-LEVEL RADIOACTIVE WASTE MANAGEMENT AND MICHAEL GARNER, SOLELY IN HIS OFFICIAL CAPACITY AS THE EXECUTIVE DIRECTOR OF THE NORTHWEST INTERSTATE COMPACT ON LOW-LEVEL RADIOACTIVE WASTE MANAGEMENT, THE STATE OF UTAH, AND ROCKY MOUNTAIN LOW-LEVEL RADIOACTIVE WASTE COMPACT,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR PARTIAL SUMMARY JUDGMENT<br><br><br><br><br>Case No. 2:08-CV-352 TS |

This matter is before the Court on Plaintiff EnergySolutions, LLC's Motion for Summary Judgment on Count I of the First Amended Complaint, a Cross Motion for Summary Judgment on Count I of Plaintiff's First Amended Complaint, filed by Defendants Northwest Interstate Compact on Low-Level Radioactive Waste Management and Michael Garner's (collectively, "Northwest") and Intervenor Defendant Rocky Mountain Low-Level Radioactive Waste Compact ("Rocky

Mountain"), and a second Cross Motion for Summary Judgment filed by Defendant State of Utah (the "State").  On February 26, 2009, all parties were present at a hearing, at which time oral arguments were presented.

EnergySolutions claims that Northwest has unlawfully prohibited importation of low level radioactive waste ("LLRW") from international sources.  Specifically, EnergySolutions argues that Northwest has attempted to exercise greater authority over the disposal of LLRW than is allowed under the current statutory regime.  EnergySolutions also argues that, in exceeding its statutory authority, Northwest's actions are in violation of the Dormant Commerce Clause.  Northwest and the State respond that Northwest acted under express authority granted to Northwest by Congress to regulate LLRW.

The parties agree, and the Court concurs, that the motions do not involve any genuine issues of material fact.  Instead, the cross motions for summary judgment present the Court with a single question of law: what did Congress intend when it enacted statutes in 1980 and 1985 addressing the disposal of LLRW?  To answer the question presented, the Court has reviewed the well-crafted memoranda submitted by the parties, along with the excellent oral arguments presented by all parties at the February 26, 2009 hearing.  The Court recognizes that strong arguments exist on both sides of this issue.  However, the Court concludes, for the reasons set forth below, that Congress has not expressed its unambiguous intent to waive Dormant Commerce Clause restrictions on regulation by regional compacts of private LLRW facilities not covered by the compact system, but which operate in interstate commerce.  The Court also concludes that Congress has expressed its unambiguous intent to waive Dormant Commerce Clause restrictions on the ability of regional compacts to regulate the disposal of LLRW generated within the compact boundaries.  The Court will, therefore, grant in part and deny in part the parties' motions, consistent with those conclusions.

2

## I.  CONSTITUTIONAL QUESTIONS

Although the question presented in this case is predominantly one of statutory interpretation, there are certain constitutional principles which provide a necessary foundation for interpreting the statute.  The first constitutional principle, the Compacts Clause, states that "[n]o State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State . . . ."[1] Northwest incorrectly asserts that "[t]he authority to enter into compacts stems from the Compact Clause of the United States Constitution . . . ."[2]  "The Compacts Clause . . . is not a grant of power either to the states or to Congress.  On the contrary, it is a prohibition . . . with an exception."[3]  States are therefore prohibited from entering into compacts that purport to authorize the states to exercise powers they could not exercise in its absence,[4] unless Congress grants formal consent to the compact within constitutional limits on congressional legislation, which formal consent "transforms the State's agreement into federal law."[5]

The second constitutional principle at play in this case is the Commerce Clause, which states that Congress has the power "to regulate . . . Commerce among the several States."[6]  "[T]he Commerce Clause has long been understood to limit the States' ability to discriminate against

---

[1] U.S. Const. art. I, § 10, cl. 3.

[2] Docket No. 41 at 11.

[3] *Seattle Master Builders Ass'n v. Pac. Northwest Elec. Power & Conservation Planning Council*, 786 F.2d 1359, 1374 (9th Cir. 1986).

[4] *United States Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 473 (1978).

[5] *Cuyler v. Adams*, 449 U.S. 433, 440 (1981).

[6] U.S. Const. art. I, § 8, cl. 3.

interstate commerce."[7]  This "dormant"[8] Commerce Clause acts to limit the ability of states to impede commerce between the states, and may be lifted only by "an expression of 'unambiguous intent' of Congress."[9]  "Whether or not the States would be permitted to burden the interstate transport of low level radioactive waste in the absence of Congress' approval, the States can clearly do so *with* Congress' approval."[10]  It is undisputed that Congress has granted approval, but the parties strongly dispute the scope and duration of that approval.

As noted, the Court is presented with only one question of law, determining the intent of Congress when it enacted statutes in 1980 and 1985 addressing the disposal of LLRW.  Specifically, the Court must determine the intent of Congress: (1) in 1980 and 1985 when it enacted statutory language establishing a framework for national regulation of LLRW disposal; and (2) in 1985 when it enacted statutory language consenting to a number of compacts for the regulation of LLRW disposal.  More specifically, the Court must determine what, if any, reservations or limitations Congress intended to be placed on its consent to Northwest's organizational documents (the "Northwest charter").[11]  The Court must also determine to what extent Congress intended to lift dormant Commerce Clause restrictions on the ability of states, and by derivation the compacts, to

---

[7]*New York v. United States*, 505 U.S. 144, 171 (1992).

[8]*Dep't of Revenue v. Davis*, 128 S.Ct. 1801, 1808 (2007).

[9]*New York*, 505 U.S. at 171 (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 458 (1992)).

[10]*Id.* (emphasis in original).

[11]In their memoranda, Northwest and the State have both objected to the use of the word "charter" by EnergySolutions to refer to Northwest's organizational documents included in the Consent Act, arguing that it minimizes the import of Congressional approval.  *See* Docket No. 46 at x, ¶ 10-12.  The Court finds this to be a needless disagreement, and will use the term "charter" to refer to Northwest's organizational documents included in the Consent Act.

4

regulate the flow of LLRW in interstate commerce and to regulate the operation of private LLRW disposal facilities operating in interstate commerce, keeping in mind that such intent must be unambiguously expressed.

## II.  FACTUAL BACKGROUND

The following facts are undisputed by the parties.  In the era of the 1960's and 1970's, as certain radioactive materials began to be used more frequently in non-power generating ways, for example in medical procedures, there arose a need to dispose of these low-level radioactive materials.  They could not be safely disposed of in traditional landfills, but they were not as dangerous as spent nuclear fuel and other highly radioactive waste.  Six facilities were established in the 1960's to dispose of LLRW but, by the late 1970's, three of the original six sites had been permanently closed, two due to serious environmental concerns and one because it had reached its capacity.  No new sites had been opened.  That left only three LLRW disposal sites in operation: Beatty, Nevada; Richland, Washington; and Barnwell, South Carolina.  The situation was further complicated by the temporary closing of the Nevada and Washington sites in order to correct some irregularities.  Thus, for a time, the South Carolina site became the destination for the vast majority of all LLRW produced in the United States.

South Carolina politicians complained that they were being forced to be the "dumping grounds" for the rest of the country.  Potential solutions were extremely limited, as South Carolina politicians believed themselves to be constrained by the dormant Commerce Clause from interfering with interstate commerce by discriminating against out-of-state LLRW.  Faced with a choice of remaining the destination for the nation's LLRW or closing the facility completely, South Carolina's governor chose the latter, and informed national politicians that there would soon be no site available for the nation's LLRW unless a national solution was devised.

The fear that the nuclear power, medical, and other related fields would be severely hampered in their development if there were no LLRW disposal sites was enough to spur action in the halls of Congress.  In 1980, Congress passed the Low Level Radioactive Waste Policy Act of 1980 (the "1980 Act"),[12] which declared that it was the responsibility of each state to provide for the disposal of the LLRW generated within its boundaries.  The 1980 Act allowed for the formation of regional compacts to manage disposal of LLRW, subject to express Congressional approval of each compact, and declared that, beginning in 1986, all regional compacts which had been approved by Congress would be allowed to close their regional disposal facilities to out-of-region LLRW.

It was hoped that the 1980 Act would be sufficient to resolve the dilemma faced by the nation with regard to disposal of LLRW, but those hopes were in vain.  By 1985, 37 states had joined seven regional compacts.  One of those compacts was Northwest, with the State of Utah as a founding member, the Utah legislature having ratified Northwest's charter in 1982.[13]  Unfortunately, the successful creation of regional compacts was not accompanied by a corresponding increase in the number of LLRW disposal sites.  No new disposal facilities were developed, and Northwest and the other sited compacts were prepared to begin excluding out-of-compact waste as soon as Congress approved their charters.  Those preparations were stalled, however, when it became apparent that politically powerful states outside of the sited regions were prepared to prevent Congressional approval of the compact charters, which would again leave sited states without authority to exclude, or discriminate against, out-of-state waste.

---

[12]P.L. 96-573.

[13]Utah Code Ann. § 19-3-201, et seq.

6

The governors of Nevada, Washington, and South Carolina refused to accept a return to the circumstances that existed prior to the 1980 Act and again threatened to close their disposal sites unless Congress acted to give greater control to those states with disposal sites.  In 1985, a compromise was achieved by two separate, but interrelated, bills: (1) the Low Level Radioactive Waste Policy Amendments Act of 1985 (the "1985 Act"),[14] which amended the 1980 Act; and (2) the Omnibus Low Level Radioactive Waste Interstate Compact Consent Act (the "Consent Act"),[15] which granted Congressional consent to all compacts ratified by the states up to that point.

A.    PROVISIONS OF THE 1985 ACT

The 1985 Act clarified certain ambiguities of the 1980 Act.  Specifically, the 1980 Act had declared that, after January 1, 1986, a compact would be allowed to "restrict the use of the regional disposal facilities under the compact to the disposal of low-level radioactive waste generated within the region."[16]   The 1980 Act had not defined the term "regional disposal facilities," an omission corrected by the 1985 Act, which defined a regional disposal facility to be "a non-Federal low-level radioactive waste disposal facility in operation on January 1, 1985, or *subsequently established and operated* under a compact."[17]   The 1985 Act also provided a transition period, in which states and regions without disposal sites would be provided with incentives to develop their own disposal sites.

Specific provisions of the 1985 Act relevant to the present case include the following:

---

[14]P.L. 96-573.

[15]P.L. 99-240 § 201 et seq.

[16]P.L. 96-573, § 4(a)(2)(B).

[17]42 U.S.C. § 2021b(11) (emphasis added).

7

(1)    a definition of "compact" which included only agreements entered into between two or more states "pursuant to" the 1985 Act;[18]

(2)    a declaration of federal policy that each state would be responsible, by itself or in cooperation with other states, for the disposal of all LLRW generated within its own boundaries, with the exception of certain specified federal LLRW;[19]

(3)    a requirement that each state with a disposal facility provide access to that facility during a transition period, and in the case of emergency;[20]

(4)    a declaration that no regional disposal facility could be required to accept material other than LLRW;[21]

(5)    a declaration that the policies of the 1985 Act were "most safely and effectively managed on a regional basis," and that, in order to carry out those policies, "the States may enter into such compacts as may be necessary to provide for the establishment and operation of regional disposal facilities for low-level radioactive waste;"[22]

---

[18]*Id.* § 2021b(4).

[19]*Id.* § 2021c(a)(1). The 1985 Act also required any state that did not provide access to a disposal facility would be required to take title to all LLRW produced within their state, a provision which was declared unconstitutional by the United States Supreme Court as being violative of the Tenth Amendment.  *New York*, 505 U.S. at 177.

[20]42 U.S.C. § 2021c(a)(1)(C).

[21]*Id.* § 2021c(a)(2).

[22]*Id.* § 2021d(a).

(6)     a declaration that nothing within the 1985 Act was to be "construed to limit the applicability of any Federal law or to diminish or otherwise impair the jurisdiction of any Federal agency" unless "expressly provided" in the 1985 Act;[23] and

(7)     a declaration that "[a]ny authority in a compact to restrict the use of the regional disposal facilities under the compact to disposal of low-level radioactive waste generated within the compact region" would not take effect until January 1, 1986, if Congress had already consented to the compact.[24]

B.     PROVISIONS OF THE CONSENT ACT

The Consent Act was passed simultaneous to the 1985 Act, and was comprised primarily of the full text of the charters of the compacts which had been created and ratified by the party states previous to passage of the Consent Act.  Certain general provisions were also included, including: (1) a Congressional finding that each of the charters, including Northwest's charter, was "in furtherance" of the 1985 Act;[25] a statement that consent of Congress to the compacts was granted "subject to the provisions" of the 1985 Act and "only for so long as the regional commission, committee, or board established in compact complies with all the provisions of such Act."[26] Referencing Northwest's charter, the Consent Act also stated that "[t]he consent of Congress is hereby given to the states of Alaska, Hawaii, Idaho, Montana, Oregon, Utah, Washington, and

---

[23]*Id.* § 2021d(b)(4).

[24]*Id.* § 2021d(c).

[25]P.L. 99-240 § 211.

[26]*Id.* § 212(2)-(3).

Wyoming to enter into the Northwest Interstate Compact on Low-Level Radioactive Waste Management, and to each and every part and article thereof."[27]

Northwest's charter was then included in the text of the Consent Act, which by consent of Congress became federal law.[28]  The charter granted Northwest regulatory power over disposal "facilities" and defined facility broadly, to include "*any* site, location, structure, or property used or to be used for the storage, treatment or disposal of low-level waste, *excluding* federal waste facilities."[29]  The charter also stated that the purposes of the compact were the protection of health and safety of the citizens of the party states and the economic management of LLRW "through . . . minimizing the amount of handling and transportation required to dispose of such wastes and through . . . providing facilities that serve the region."[30]  Under the Article titled "Regional Facilities," the charter also prohibited any facility in any party state from accepting any LLRW generated outside the region unless consent was granted by Northwest.[31]

C.    HISTORY OF THE CLIVE FACILITY

In 1988, Envirocare, a predecessor of EnergySolutions, obtained a Utah radioactive materials license to receive and dispose of "naturally occurring radioactive waste," materials not classified as LLRW.  These materials were disposed of by Envirocare at a disposal facility in Tooele County, Utah known as the "Clive Facility."  In 1990, the Nuclear Regulatory Commission ("NRC")

---

[27]*Id.* § 221.

[28]*See Cuyler*, 449 U.S. at 440.

[29]P.L. 99-240 § 221, Art. II(1) (emphasis added).

[30]*Id.* § 221, Art. I.

[31]*Id.* § 221, Art. IV(2).  As part of Northwest, the State had access to the existing Washington disposal site.

delegated authority to Utah to license LLRW disposal facilities within the State.  Also in 1990, Envirocare applied for a license to dispose of Class A LLRW,[32] and that license was issued by the State in 1991.  However, Condition 9 of the license required Envirocare to obtain approval from Northwest before Envirocare could begin disposal.  Northwest granted consent, but the State amended the license to also require the consent of the compact that governed the state or region where the LLRW originated.

Over the years, Northwest has passed several resolutions defining the precise types of LLRW which Envirocare, and later EnergySolutions, was allowed to accept at the Clive Facility.  Some of these resolutions were passed at the request of Envirocare, while others were instigated by Northwest itself.  At no time did Northwest assume any authority for licensing or operating the Clive Facility, but Northwest claims to have "retained the right to modify or rescind the access authorization [granted in 1991]."[33]

In 2000, Envirocare applied for a new license to dispose of Class B and Class C LLRW. Technical approval was granted by the Utah Division of Radiation Control, but the Utah legislature and governor did not grant the approval required by Utah Code Ann. § 19-3-105(3) before the license could be issued.  Therefore, only Class A LLRW may be disposed of at the Clive facility.

EnergySolutions' current license, which was granted on May 16, 2008, and is set to expire in 2013, requires that transfer of LLRW to the Clive Facility from outside the Northwest Compact area be approved by the compact of origin, and it further requires approval by Northwest if the Clive Facility is to receive LLRW generated within the boundaries of Northwest.  However, the original

---

[32]LLRW is classified according to the level of radioactivity.  Class A waste is the least radioactive, followed by Class B waste, with Class C waste being the most radioactive.

[33]Docket No. 44 ¶ 30d.

Condition 9, which required approval of Northwest to import LLRW from *outside* Northwest's boundaries, is not present in EnergySolutions' current license.

D.    THE CURRENT DISPUTE

On May 1, 2006, Northwest issued its Third Amended Resolution and Order (the "Third Resolution").[34]  The Third Resolution, among other things: (1) expressly granted access to the Clive facility for LLRW "allowed under" the license granted by the State;[35] (2) required consent by the compact from which the LLRW originated;[36] (3) imposed certain reporting requirements on EnergySolutions;[37] and (4) retained the right by Northwest to rescind or modify approval "at any time."[38]

On September 14, 2007, EnergySolutions applied for a license from the NRC to import LLRW from nuclear facilities in Italy.  Those portions of the LLRW which could be classified as Class A LLRW (the "Italian LLRW") would be disposed of at the Clive Facility.[39]

---

[34]Docket No. 44, Ex. E at 12-13.

[35]*Id.* ¶ 2.

[36]*Id.* ¶ 5.

[37]*Id.* ¶ 6.

[38]*Id.* ¶ 7.

[39]EnergySolutions alleges, in the Amended Complaint, that the Italian LLRW is "scientifically indistinguishable from material that EnergySolutions currently receives from US and international generators of LLRW."  Docket No. 12, ¶ 15.  Northwest concedes that the Italian LLRW is classified as Class A LLRW, but argues that it has insufficient information to admit or deny that the Italian LLRW is "scientifically indistinguishable" from the LLRW currently disposed of at the Clive Facility.  Docket No. 22, ¶15.  The State, likewise, argues that it has insufficient evidence to admit or deny EnergySolutions claims.  Docket No. 33, ¶15.

On February 19, 2008, the NRC solicited the comments of Northwest regarding the proposed importation of the Italian LLRW.  Northwest responded that it would review EnergySolution's license and determine whether it would approve the Italian LLRW.  On May 8, 2008, Northwest's governing body met and, at the request of the State, amended the Third Resolution to prohibit the Clive Facility from importing the Italian LLRW, as well as any other international LLRW.

The text of the resolution issued by Northwest after the May 8, 2008 meeting purported to merely clarify that the existing license did not allow for the importation of foreign generated LLRW, and that specific approval for such would be required under the Northwest charter.  However, there is no language in the license issued to EnergySolutions by the State which restricts the Clive Facility to receive only domestically generated LLRW.  Thus, the Court finds that the May 8, 2008 resolution cannot be considered merely a clarification, but is, instead, an amendment of the approval previously granted by Northwest.

Unwilling to accept the regulatory denial by Northwest, EnergySolutions filed this lawsuit seeking declaratory judgment that Northwest has no statutory or other authority to regulate the importation of out-of-region LLRW to the Clive Facility.  Thus, EnergySolutions, for the first time since it's initial license in 1991, and after apparently accepting Northwest authority to regulate for nearly seventeen years, challenges any requirement to abide by the wishes of Northwest.

IV.  STANDARD OF REVIEW

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[40]  In considering whether genuine issues of material fact exist, the Court determines whether a reasonable jury could return

---

[40]*See* Fed. R. Civ. P. 56(c).

a verdict for the nonmoving party in the face of all the evidence presented.[41]   The Court is required

to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[42]

## V.  DISCUSSION

In order to answer the issue of law before the Court in this case, namely the intent of Congress in passing legislation in 1980 and 1985 regulating the disposal of LLRW–specifically the 1980 Act, the 1985 Act, and the Consent Act–the Court must address three questions of statutory interpretation: (1) whether the Clive Facility is a "regional disposal facility" as defined in the 1985 Act; (2) the scope of authority to discriminate against out-of-region LLRW granted by (i) the 1985 Act and (ii) the Consent Act; and (3) whether the respective grants of authority are contradictory and, if so, how those contradictions are to be resolved.

## A.    IS THE CLIVE FACILITY A "REGIONAL DISPOSAL FACILITY?"

All parties agree that the 1985 Act granted Northwest, and every other compact, the authority to restrict or prohibit the importation of out-of-region LLRW to the compact's regional disposal facilities.   In the 1985 Act, a regional disposal facility is defined as "a non-Federal low-level radioactive waste disposal facility in operation on January 1, 1985, or subsequently established and operated under a compact."[43]   It is undisputed that the Clive Facility was not in operation in 1985. Northwest claims that the Clive Facility is nonetheless a regional disposal facility because it has been "established and operated under a compact" by virtue of the requirement, imposed by Utah in

---

[41]*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).

[42]*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Shero v. City of Grove, Okl.,* 510 F.3d 1196, 1200 (10th Cir. 2007).

[43]42 U.S.C. § 2021b(11).

1991, that approval be granted by Northwest before LLRW would be allowed at the Clive Facility.

EnergySolutions responds that the Clive Facility is, and has always been, a private, for profit enterprise, and cannot be considered to be operated and established under Northwest.  Northwest disputes the relevance of this argument, pointing out that all LLRW facilities currently in operation are commercial, for profit enterprises.  Moreover, between 1991 and 2008, Northwest acted in a manner consistent with a regulatory body which had authority to impose restrictions on the Clive Facility and EnergySolutions has complied with requests by the State and Northwest regarding the Clive Facility.

Northwest and the State argue that seventeen years of compliance is evidence that even EnergySolutions believed themselves to be subject to Northwest's authority.  This argument is premised on the implicit assumption that the State could transform the Clive Facility into a regional disposal facility by conditioning approval of the Clive Facility license on consent by Northwest and compliance by EnergySolutions.  However, the Court concludes that the State cannot delegate to Northwest authority which the State does not possess, and because discrimination against out-of-state LLRW implicates the Dormant Commerce Clause, neither EnergySolutions' actions nor belief in Northwest's alleged authority to regulate is sufficient to bestow actual legal authority on Northwest.  Only Congress may grant that authority under the Commerce Clause and the Interstate Compacts Clause.  Therefore, designation of the Clive Facility as a regional disposal facility must be founded upon the 1985 Act, which defined the term.

Moreover, if past conduct may be taken as evidence of the parties' understanding, the Court notes that Northwest has argued in prior court proceedings[44] that the Clive Facility is not a regional

_____

[44]*United States Ecology, Inc. v. Northwest Interstate Compact, et al.*, No. C92-5091B (W.D. Wash. filed Mar. 10, 1992).

disposal facility.  While the Court agrees with Northwest that statements by Northwest made in the prior proceeding are not binding, the Court also does not consider EnergySolutions' prior acquiescence to Northwest's prior assertions of authority as dispositive of whether Northwest has the authority it has claimed in the past.

Northwest operates, through a private contractor, a disposal site north of Richland, Washington, on the federal Hanford Nuclear Reservation (the "Richland Facility").  There is no question that the Richland Facility is a regional disposal facility, for it has been the repository of LLRW generated by Northwest's party states since the creation of the compact, and was in operation prior to 1985, bringing it within the 1985 Act's definition of regional disposal facility.  Moreover, the Richland Facility sits on land leased from the State of Washington for the express purpose of operating a disposal facility for Northwest.[45]  In contrast, the Clive Facility was not established by Northwest or by the State, nor is it currently operated by Northwest or the State.  From the beginning, the Clive Facility has been operated solely for the benefit of Envirocare and, later, EnergySolutions, albeit under the regulatory auspices of the State.  However, Defendants all argue that both the Richland and Clive Facilities are privately run and operate ostensibly by the consent of Northwest.  Thus, Defendants imply that, if the Richland Facility is a regional disposal facility, so is the Clive Facility.

As previously noted, the 1985 Act clarifies the 1980 Act's ambiguous reference to regional disposal facility, which is evidence that Congress understood that there would be some LLRW disposal facilities that would not be considered regional disposal facilities.  This fact is further

---

[45]*See* Docket No. 42, Attachment M at 2, ¶ 4 (Sublease between the State of Washington and U.S. Ecology Washington, Inc.); *id.* at 9, ¶ 2 (granting right to terminate the sublease "should [Northwest] lose the authority provided by [the 1985 Act] to exclude access to the subleased premises for the disposal of out-of-compact region low-level radioactive waste.").

supported by the Committee Report from the House Committee on Interior and Insular Affairs (the "IIA Report"),[46] which states that "[n]either low-level waste disposal facilities which were in operation prior to [1985] but which have terminated commercial operations, nor low-level waste disposal facilities established by a state or private concern but not under the auspices of a compact region, would be included."[47]  The parties agreed, during oral arguments, that Congress, in passing the 1985 Act, understood that not all facilities would be considered regional disposal facilities.

Northwest argues that the language of the IIA Report proves that a facility need not be operated *by* a compact in order to be a regional disposal facility, but only that it be operated *under the auspices of* a compact.  While a fine distinction, it is not an insignificant one.  As noted above, the Richland Facility is a regional disposal facility, by nature of its operation as an LLRW disposal facility in 1985.  Even if it had not been in operation in 1985, however, the Richland Facility clearly operates *under* Northwest in a way that the Clive Facility does not.  Most importantly, it is facility which is operated with the express purpose of serving Northwest and its member states.  It is also operated on land leased from the State of Washington for the express purpose of providing a disposal site for the region's LLRW.  The Clive Facility, on the other hand, is allowed to receive only limited amounts of LLRW from Northwest member states, and must, therefore, rely entirely upon shipments of LLRW from outside the state in order to operate profitably.

When questioned at the February 26, 2009, hearing, Northwest initially claimed that there were no fundamental differences between the Richland Facility and the Clive Facility.  However,

---

[46]H.R. Rept. 99-314, pt. 1 (1985).

[47]*Id.* at 24.

upon further questioning, and the fact that the State conceded that the State had always considered the two facilities to be different, Northwest also conceded the point.

Even though the Clive Facility was not established by Northwest and is not run by Northwest, Northwest and the State essentially argue that the State, by means of its licensing requirements, transformed the Clive Facility into a regional disposal facility by requiring it to operate *under* Northwest. That argument is without merit. Either the site is a regional disposal facility by virtue of its establishment and operation or it is not–state regulatory action cannot make it so in the absence of clear statutory language allowing such a designation. The Court finds that the Clive Facility was not established by Northwest, that it is not operated *under* Northwest, as required by the 1980 and 1985 Acts, and that the State's regulatory requirements are insufficient to designate the Clive Facility as a regional disposal facility under the 1985 Act.

B.   SCOPE OF AUTHORITY OVER OUT-OF-REGION WASTE

The Court is faced with a difficult task in determining whether Congress intended to grant Northwest the authority and power to exclude out-of-region waste only from regional disposal facilities or from all LLRW facilities. The difficulty arises from the existence of three separate acts–the 1980 Act, the 1985 Act, and the Consent Act–all of which remain in effect[48] and define, to a greater or lesser extent, the scope of authority granted to Northwest and other compacts. Taken separately, each Act would pose certain problems of interpretation for the Court, but the conflicts arising from the combination of all three Acts pose special difficulties associated with identifying

---

[48]At the February 26, 2009 hearing, EnergySolutions stated its belief that the 1980 Act is no longer in effect, but that it must be looked to for the context of the 1985 Act. The Court does not agree. As discussed in further detail below, neither the text nor the legislative history of the 1985 Act evidences an intent by Congress to entirely supplant the 1980 Act. Therefore, the Court finds that those provisions of the 1980 Act not amended by the 1985 Act are still in effect.

which provisions from each Act are retained as Congress enacts new legislation.  The Court will, therefore, examine each subsequent piece of legislation in order of passage, in order to determine if and how the scope of authority over out-of-region waste has been modified by Congressional action.

    1.    *The Low Level Radioactive Waste Policy Act of 1980*

The 1980 Act gave authority to the states to enter into interstate compacts, subject to ratification by Congress, and declared that Congressionally-ratified compacts would have authority to "restrict the use of the regional disposal facilities under the compact to the disposal of low-level radioactive waste generated within the region."[49]  The 1980 Act did not expressly define regional disposal facility, but it did authorize states to enter into "such compacts as may be necessary to provide for the establishment and operation"[50] of regional disposal facilities.  In a similar vein, the 1980 Act, in granting the right to limit access, does so with respect to "regional disposal facilities *under* the compact."[51]

These statements, along with the history LLRW disposal which led to passage of the 1980 Act, imply a narrow definition of regional disposal facility and a narrow scope of authority to

---

[49]P.L. 96-573, § 4(a)(2)(B).  Northwest cites to The Low-Level Waste Handbook, a guide produced by the National Governor's Association, which states that the "overriding objective" of governors in pushing for passage of the 1980 Act was to allow regions to "exclude waste generated outside their borders."  Docket No. 64, Ex. 1, at iii.  The Low-Level Waste Handbook, however, is not federal law and the text of the 1980 Act restricts discriminatory authority to the operation of regional disposal facilities.  Moreover, the document cited by Northwest contradicts its own argument, for it states that the "primary motivation" of the governors was a general concern for the health and safety of their citizens, and that excluding out-of-region waste was "also indicated" as a motivation.

[50]*Id.* § 4(a)(2)(A).

[51]*Id.* § 4(a)(2)(B) (emphasis added).

exclude out-of-region waste.  A narrow definition is also required by the fact that regulation of LLRW implicates interstate commerce in its production, transportation, and even disposal, and that any waiver of the Dormant Commerce Clause must be in unambiguous terms.  Therefore, even without the express definition of regional disposal facility, contained in the 1985 Act, the Clive Facility would not have been considered a regional disposal facility, as it was not established *under* Northwest, nor was the existence of Northwest necessary to the establishment and operation of the Clive Facility.  Therefore, under the 1980 Act, Northwest would have had no authority to exclude out-of-region waste from the Clive Facility.

2.     *The Low Level Radioactive Waste Policy Amendments Act of 1985*

The 1985 Act added some clarity to the issues before the Court, by expressly defining regional disposal facility as "a non-Federal low-level radioactive waste disposal site in operation on January 1, 1985, or subsequently established and operated under a compact."[52]  The Court has already found that the Clive Facility is not a regional disposal facility, as defined by the 1985 Act.

Unfortunately, the 1985 Act did not eliminate all ambiguity.[53]  For example, the 1985 Act does not contain language authorizing exclusion of out-of-region waste by Congressionally-approved compacts, as did the 1980 Act, but neither does it contain language abolishing the authority granted by the 1980 Act.  Certain provisions of the 1985 Act describe a period of transition, in which the compact would be entitled to restrict access to the regional disposal facilities to states and compacts

---

[52]42 U.S.C. § 2021b(11).

[53]Representative Lujan, then Ranking Member of the House Committee on Interior and Insular Affairs, stated the following regarding the 1985 Act's complexity: "Andrea Dravo, the Energy and Environment staff member who has literally spent years working on this legislation, may be the only living human being who completely understands exactly how [the 1985 Act] will operate."  131 Cong. Rec. H11403-02, 1985 WL 205225 (Dec. 9, 1985).

which had made progress towards development of their own LLRW disposal facilities.[54]
EnergySolutions also points to the following language:

> Any authority in a compact to restrict the use of the regional disposal facilities under
> the compact to the disposal of low-level radioactive waste generated within the
> compact region shall not take effect before each of the following occurs: (1) January
> 1, 1986; and (2) the Congress by law consents to the compact.[55]

EnergySolutions argues that this subsection, when viewed in context of the 1980 Act, further
supports its claim that Congress intended only to provide the compacts with authority to exclude out-
of-region waste from regional disposal facilities. Rocky Mountain argues that any limitations on the
compacts' ability to restrict access to disposal facilities within the compact boundaries were intended
to be temporary only. After the transition period, described above, the compacts' discriminatory
authority would be constrained only by their own organizational documents.

The provision of the 1980 Act which authorizes compacts to exclude out-of-region waste
from their regional disposal facilities is not supplanted by any language in the 1985 Act, nor has it
ever been repealed, so the Court finds that the 1985 Act confers upon Northwest and other compacts
the same authority granted in the 1980 Act, namely the authority to exclude out-of-region waste from
the compacts' regional disposal facilities.

Regulation of a LLRW disposal site which operates in interstate commerce is an exercise of
interstate commerce power and requires, therefore, an expression of unambiguous intent by Congress
to waive Dormant Commerce Clause restrictions. As noted previously, the NRC delegated licensing
authority for LLRW disposal sites to the State of Utah, waiving Dormant Commerce Clause
restrictions for the limited purpose of licensing disposal sites. The 1985 Act contains an

---

[54]42 U.S.C. § 2021e.

[55]42 U.S.C. § 2021d(c).

unambiguous expression of Congressional intent to waive Dormant Commerce Clause restrictions on the regulation of regional disposal facilities.  However, the Court concludes that the 1985 Act contains no unambiguous expression of Congressional intent to further waive Dormant Commerce Clause restrictions on regulation of LLRW disposal sites that are not regional disposal facilities.

Because the Clive Facility is not a regional disposal facility, the Court finds that the 1985 Act does not grant to Northwest the authority to exclude out-of-region waste from the Clive Facility. However, even if the 1985 Act does not grant the authority claimed by Northwest and Rocky Mountain, however, the Court must consider whether such authority is granted by the Consent Act.

3.      *Omnibus Low Level Radioactive Waste Interstate Compact Consent Act*

The Consent Act provides much greater discriminatory authority than the 1985 Act.  Rather than constrain its discriminatory authority to regional disposal facilities, the Northwest Charter, adopted by Congress in the Consent Act, requires Northwest's approval before out-of-region LLRW is accepted by any "facility" within a party state.[56]  Facility is defined as "any site, location, structure, or property used or to be used for the storage, treatment, or disposal of low-level waste, excluding federal waste facilities."[57]  EnergySolutions concedes that the Northwest charter, as adopted by the Consent Act, provides sufficient discriminatory authority to allow Northwest to regulate the flow of out-of-region LLRW to the Clive Facility.

While the Northwest charter was not drafted by Congress, its ratification by Congress transforms it into federal law.  Defendants argue that the Court need go no further, that authority under the Consent Act is sufficient to establish, as a matter of law, that Northwest has the legal

---

[56]Docket No. 46, Ex. 1, at 4 (Northwest charter, § 2).

[57]*Id.* at 3 (Northwest charter, § 1).

authority to exclude out-of-region waste from the Clive Facility.  In support of their argument, they point to language in the Consent Act, that "[t]he Consent of Congress is hereby given to the states of Alaska, Hawaii, Idaho, Montana, Oregon, Utah, Washington, and Wyoming to enter into the Northwest Interstate Compact on Low-level Radioactive Waste Management, *and to each and every part and article thereof.*"[58]  EnergySolutions argues, in response, that the 1980 Act and 1985 Act were intended to be the source of all compact authority, and that the Consent Act was the method by which that authority would be officially bestowed upon individual compacts.

The 1980 and 1985 Acts required that compacts gain express consent from Congress before compacts would have any regulatory authority,[59] as a statutory and constitutional prerequisite to the operation of the interstate compact system.  The Court therefore finds that the 1980 Act, as amended by the 1985 Act, is the source of authority for states to enter into interstate compacts pursuant to the Compacts Clause.  However, both the 1980 Act, as amended by the 1985 Act, and the Consent Act, may provide Congressional authority for the states, through compacts, to discriminate against interstate commerce.

As discussed previously, the 1980 Act expressed Congress' unambiguous intent to lift the restrictions on state action imposed by the dormant Commerce Clause, but only insofar as necessary to allow compacts to restrict access to regional disposal facilities.  Nothing in the 1985 Act expresses an unambiguous intent by Congress to modify the regime established by the 1980 Act.

---

[58] 42 U.S.C. 2021d note, § 221 (emphasis added).

[59] P.L. 96-573, § 4(a)(2)(B) ("A compact entered into . . . shall not take effect until the Congress has by law consented to the compact."); 42 U.S.C. § 2021d(c) ("Any authority in a compact to restrict the use of the regional disposal facilities . . . shall not take effect before . . . the Congress by law consents to the compact.").  *See also* U.S. Const. art. I, § 10, cl. 3.

Provisions of the Consent Act imply an intent by Congress to lift Commerce Clause restrictions on state action, but other provisions in the Consent Act counter those implications.  As noted, the Consent Act grants Congressional consent to the Northwest charter, and "to each and every part and article thereof."[60]  However, the Consent Act also states that consent of Congress to the compact charters was granted "subject to the provisions" of the 1985 Act, and that consent is granted "only for so long" as the governing body of the compacts complied "with all of the provisions" of the 1985 Act.[61]  The Consent Act also clearly states that the compacts are "in furtherance" of the 1980 Act as amended by the 1985 Act.[62]  The 1980 Act, in turn, approves the establishment of "such [interstate] compacts *as may be necessary to provide for the establishment and operation of regional disposal facilities* for low level radioactive waste."[63]

The language of the Consent Act indicates Congressional intent to place some restrictions on the scope of authority bestowed by Consent Act approval of the compact charters.  The language of the 1980 Act also indicates that Congress did not intend to grant the charters unlimited authority.  It is therefore unclear that Congress intended to grant the broad authority contained in the Consent Act.

4.      *Legislative History and Congressional Intent*

As the plain language of the Acts is insufficient to resolve the issue before the Court, the Court will turn to other sources to determine if it is possible to clarify how much exclusionary

---

[60]42 U.S.C. 2021d note, § 221 (emphasis added).

[61]P.L. 99-240 §§ 212(2)-(3), 99 Stat. 1859.

[62]42 U.S.C. 2021d note, § 211.

[63]P.L. 96-573 § 4(a)(2)(A) (emphasis added).

authority Congress intended to grant Northwest and other compacts under the Acts.  The history of LLRW disposal in the United States was discussed in greater detail previously.  LLRW disposal sites were declining in number, and those states with disposal sites had declared their intention to close the existing sites, since they were prohibited from excluding out-of-state waste.  The 1980 Act was intended to provide a time period in which states could enter into compacts and develop their own disposal sites.  Once that time period had expired, the states and regions with existing disposal sites would be entitled to shut them to outside waste.  Under that plan, compacts could regulate importation of LLRW into their region by regulating regional disposal facilities.  However, it became clear, as 1985 approached, that Congress had underestimated the time necessary to overcome the political, technical, and other barriers to establishing a viable LLRW disposal site system.

Some states had organized themselves around existing disposal sites, establishing compacts and submitting the charters for Congressional approval.  Those states did so, however, without the additional clarification offered by the 1985 Act on ambiguous terms contained in the 1980 Act.  All other states faced the bleak prospect of having no place to dispose of their LLRW once Congressional approval had been given to the compacts.  Those states without a disposal site threatened to hold up Congressional approval, leading the country right back to the pre-1980 position of uncertainty regarding the future of LLRW disposal.  It was only through the establishment of a period of transition, restrictions on access to existing disposal sites during that period, and the promise that compacts could exclude out-of-region LLRW from their regional disposal sites at the end of the transition that charter states and non-charter states were able to reach a compromise regarding a national policy for LLRW disposal.  That compromise took the form of passage of the 1985 Act jointly with ratification of the compact charters in the Consent Act.

As noted, however, there are potential conflicts between the Consent Act and the 1980 Act, as amended by the 1985 Act.  The issue presently before the Court is not the only potential conflict, however, as two additional conflicts were specifically addressed during debate on the Acts.  First, Senator Leahy, on the floor of the Senate, stated the following regarding a judicial review provision contained in one of the compact charters:

> I would have preferred it if the [judicial review] language . . . had not been ratified by the States that are parties to this compact.  At worst it is unconstitutional.  At best it is confusing.  Although I would not support it myself, I believe that rather than delete this section and thereby require the States to repeat the lengthy ratification process, it is best to pass this legislation together with the judicial review amendment to the congressional transition legislation . . . .[64]

Second, the House Report on the Consent Act noted that:

> Interstate compacts or states may develop definitions of low-level radioactive waste which are not identical to this definition of state responsibility.  Such definitions may be used by the compacts or states for their own administrative purposes, but those definitions do not affect the definition of the kind of radioactive material for which states are responsible for providing for disposal.[65]

Congress also understood that there might be other, unforseen, conflicts.[66]  The IIA Report states: "It is the conclusion of the committee that Congress can condition its consent to low level radioactive Waste compacts without necessitating formal re-ratification of the compacts by the

---

[64]131 Cong. Rec. S18102-01, 1985 WL 699020 (Dec. 19, 1985) (Statement of Sen. Leahy).

[65]H.R. Rept. 99-315, Part I, at 6.

[66]See 131 Cong. Rec. S18102-01, 1985 WL 699020 (Dec. 19, 1985) (Statement of Sen. Simpson) ("No amendments have been made in the compacts, per se, in an effort to avoid the potential need for subsequent State reratification.  Nevertheless, if any such compact is implemented in a manner inconsistent with any of the provisions set forth in this bill, the entire compact shall be deemed to be invalid . . . .").

states."[67]  Considering that the compact charters were drafted by the states, with only sparse guidance from the 1980 Act, it was almost assured that there would arise conflicts, either in language or in implementation.  This is especially true with the question of the scope of compacts' authority to exclude out-of-region LLRW, for while the 1980 Act implied certain parameters for what would qualify as a regional disposal facility, and therefore be subject to restrictions by compacts, individual compacts and their party states may not have recognized or accepted those implications.  Thus, compacts may have, in their charters, greatly expanded the scope of their discriminatory authority in good faith, without any intent to violate the 1980 Act.

Unfortunately, a resort to the legislative history of the 1985 Act and Consent Act to determine Congressional intent regarding the scope of compacts' exclusionary authority yields very little in the way of clarification.  The IIA Report, for example, states that compacts are granted "the authority to control import or export of waste to or from compact regions,"[68] indicating broad discriminatory authority, but also states that:

> In order to encourage states to form regional organizations to provide for low-level radioactive waste disposal, [42 U.S.C. § 2021d] describes certain conditions under which states would be authorized by Congress, with specific additional Congressional ratification required of any compact, to exclude radioactive waste generated outside regional disposal groups *from use of facilities established and operated by the compact*.[69]

Representative Edward Markey stated his belief that "a key element" of the 1980 Act was that which allowed compacts "to exclude waste from outside their compact regions as of January 1,

---

[67]H.R. Rept. 99-314, pt. 1 at 21.

[68]H.R. Rept. 99-314, pt. 1 at 15.

[69]*Id.* at 26 (emphasis added).

1986,"[70] and Representative Butler Derrick stated that the 1980 Act would allow Congressionally approved compacts, "beginning January 1, 1986, . . . [to] exclude from disposal all waste generated outside the compact region."[71]   However, Representative Morris Udall, Chairman of the Committee which considered the 1985 Act, also stated that under the 1985 Act, "States which operate disposal facilities under the auspices of a regional compact ratified by Congress will be authorized to close *those facilities* to waste not generated within the compact region."[72]   Likewise, Senator Alan Simpson stated that "[u]pon enactment of [the 1985 Act and the Consent Act], each such compact region may restrict the use of a regional disposal facility located within such compact regions . . . to the disposal of a low-level radioactive waste generated within such region."[73]   Depending on the speaker, the 1985 Act was described as granting either power to exclude LLRW from the region or to exclude it only from regional disposal facilities.

These seeming contradictions may be explained somewhat by concerns expressed during debate on Acts that, without Congressional action, there would soon be no LLRW disposal facilities operating in the United States.   The State stated, at the February 26, 2009 hearing, that it only authorized the Clive Facility's disposal of LLRW, conditional upon approval by Northwest, because it believed that Northwest's discriminatory authority over out-of-region waste would protect it from becoming a "dumping ground."   It is likely that similar decisions are regularly made by states and compacts, and that Congress intended to create the incentives that would result in increased LLRW

---

[70]131 Cong. Rec. H11403-02, 1985 WL 205255 (Dec. 9, 1985).

[71]*Id.*

[72]131 Cong. Rec. E5408-03, 1985 WL 722250 (Dec. 4, 1985) (emphasis added).

[73]131 Cong. Rec. S18102-01, 1985 WL 699020 (Dec. 19, 1985).

disposal capacity.  It is not improbable, then, that denying compacts the right to exclude out-of-state waste would lead to states losing confidence in the compact system created by the Acts, and the country returning to the circumstances which led to the need for the Acts.

It is undisputed that the primary purpose of the Acts was to assure the continued provision of LLRW disposal capacity, to encourage an increase in the total disposal capacity, and to spread the burden of providing disposal capacity more broadly.  Granting blanket discriminatory authority to compacts, however, may also go contrary to that purpose by creating substantial disincentives to the development of purely private LLRW disposal capacity, such as the Clive Facility.  For example, if the 1985 Act is intended to grant full discriminatory authority over LLRW disposal facilities, a compact would be well within its authority to effectively shut down any LLRW facility within its boundaries, simply by denying it the right to receive LLRW from inside or outside of the compact region.

Upon questioning at the February 26, 2009, hearing, Northwest admitted that, under its interpretation of the 1985 Act, it had authority to do just that, although it disclaimed any such intention.  The Court accepts Northwest's representation that it has no intention of depriving EnergySolutions of the ability to import domestic LLRW, but is troubled by the potential for abuse if private LLRW disposal facilities were to be left so completely at the whims of the compacts. Uncertainty thus created may be sufficient to deter private efforts to increase LLRW disposal capacity, and thereby frustrate, in part, the intent of the Acts.  Furthermore, the potential to regulate a private LLRW facility out of existence is the potential to severely interfere with interstate commerce and is not, in this case, accompanied by an unambiguous expression of Congressional intent to permit such interference.

After careful consideration of the Constitutional policy reflected in the Dormant Commerce Clause, the text of the Acts, and the legislative history and policy objectives of the Acts, the Court finds that the Consent Act does not express an unambiguous intent by Congress to grant the nearly unlimited exclusionary authority over LLRW disposal within the compact boundaries which is claimed by Defendants.  The Court finds that the 1980 Act is the only unambiguous expression of intent by Congress to lift dormant Commerce Clause restrictions on state regulation of interstate commerce in LLRW.  The Court also finds that, as it pertains to importation of LLRW from outside Northwest's regional boundaries, Northwest has authority only to restrict access to its regional disposal facility.  Because the Court finds that the Clive Facility is not a regional disposal facility, the Court finds that Northwest has no authority to restrict the flow of out-of-region waste to the Clive Facility and EnergySolutions' Motion for Partial Summary Judgment will be granted in part.

The Court notes, however, that the request for relief on Count I of Plaintiff's First Amended Complaint is declaratory judgment that Northwest "lacks authority to restrict the flow of LLRW to the Clive Facility."[74]  The evidence presented by the parties in their memoranda and during oral arguments centered solely around the question of whether Northwest has authority to restrict the flow of out-of-region LLRW to the Clive Facility.  There is little evidence presently before the Court regarding the authority of Northwest to regulate in-region waste. The 1980 Act, however, does declare that "low level radioactive waste can be most safely and efficiently managed on a regional basis."[75]

---

[74]Docket No. 3 at 11.

[75]P.L. 96-573, § 4(a)(1)(B).

While the Court does not find this to be an unambiguous expression of intent to allow compacts to discriminate against out-of-region waste, the Court does find it, along with similar references in the legislative history, to be an unambiguous expression of Congressional intent to allow Northwest to regulate the disposal of waste generated within Northwest's regional boundaries. Therefore, to the extent that EnergySolutions' Motion for Summary Judgment requests declaratory judgment that Northwest has no authority to regulate the flow of in-region waste to the Clive Facility, it will be denied in part.

## IV.  CONCLUSION

It is therefore

ORDERED that Plaintiff EnergySolutions, LLC's Motion for Summary Judgment on Count I of the First Amended Complaint (Docket No. 35) is GRANTED IN PART AND DENIED IN PART as described above.  It is further

ORDERED that Defendants Northwest Interstate Compact on Low-Level Radioactive Waste Management and Rocky Mountain Low-Level Radioactive Waste Board's Cross-Motion for Summary Judgment on Count I of Plaintiff's First Amended Complaint (Docket No. 40) is DENIED. It is further

ORDERED that Defendant State of Utah's Cross Motion for Summary Judgment on Count I of the First Amended Complaint (Docket No. 45) is DENIED.

DATED   May 15, 2009.

BY THE COURT:

_____
TED STEWART
United States District Judge

31